**United States District Court for**
**the District of Maryland**

**United States**

**v.**

**Sean Sullivan**

**No. 1:23-cr-257-JRR-1**

## Motion to Dismiss Count Twenty-Five

Sean Sullivan is charged, among other offenses, with one count of possessing a machinegun, in violation of 18 U.S.C. § 922(o). Under the logic of *United States v. Lopez*, 514 U.S. 549 (1995), that statute lies beyond Congress' power to regulate interstate commerce. *Lopez* held that 18 U.S.C. § 922(q)—which prohibited possessing a firearm in a school zone—could not be sustained under the Commerce Clause because the statute regulated non-economic activity (i.e., simple possession of a gun) and did not contain a jurisdictional element that "would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." 514 U.S. at 561. The same is true of § 922(o): it regulates simple possession of a machinegun, which is non-economic in nature, and it lacks the kind of jurisdictional element present in most other federal firearms prohibitions, e.g., requiring that a firearm have moved "in interstate or foreign

commerce." Upholding § 922(o) as an exercise of Congress' power to regulate interstate commerce would, contrary to *Lopez*, confer on the federal government "a general police power of the sort retained by the States." *Id.* at 567. Consistent with *Lopez*, the Court should therefore hold § 922(o) is unauthorized by Congress' enumerated powers and dismiss count twenty-five of the indictment.

## I. Procedural history

On July 27, 2023, a grand jury returned an indictment charging Mr. Sullivan with one count of conspiracy to commit various firearms-related offenses, under 18 U.S.C. § 371; ten counts of unlawfully importing firearms, under 18 U.S.C. § 922(l); eight counts of making false statements in records relating to the acquisition of certain firearms, under 18 U.S.C. § 924(a)(1)(A); five counts of making false statements in a matter within the jurisdiction of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, under 18 U.S.C. § 1001; one count of possessing a machinegun, under 18 U.S.C. § 922(o); and one count of money-laundering, under 18 U.S.C. § 1957. ECF 51 at 1-29.

Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun," but excepts, as relevant here, "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect." § 922(o)(1), (2)(B). Unlike most other portions of 18 U.S.C. § 922, the prohibition in § 922(o) contains no requirement that a machinegun have moved in or affected interstate commerce. *See, e.g.*, § 922(g) (prohibiting various classes of people from "ship[ping] or transport[ing] in interstate or foreign commerce, or possess[ing] in or affecting commerce, any firearm or ammunition" or from "receiv[ing] any firearm

or ammunition which has been shipped or transported in interstate or foreign commerce").

Section 922(o) was enacted as part of the Firearms Owners' Protection Act of 1986. *United States v. Rybar*, 103 F.3d 273, 281 (3d Cir. 1996) (citing Pub. L. No. 99–308, 100 Stat. 449). Thus § 922(o) "criminalizes, with limited exceptions, the mere possession of machineguns that were acquired after May 19, 1986 regardless of whether these guns traveled in or otherwise affected interstate commerce." *United States v. Wright*, 117 F.3d 1265, 1268 (11th Cir. 1997), *vacated in part on reh'g on other grounds*, 133 F.3d 1412 (11th Cir. 1998).

## II. Argument

### A. Legal background

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854 (2014). The federal government lacks the states' "broad authority to enact legislation for the public good—what [the Supreme Court has] often called a 'police power.'" *Id.* Instead, Congress enjoys only those "few and defined" powers that are specifically enumerated in the Constitution. *Gregory v. Ashcroft*, 501 U.S. 452, 457-58 (1991). It is therefore "clear that, lacking a police power, Congress cannot punish felonies generally." *Bond*, 572 U.S. at 854. "A criminal act committed wholly within a State cannot be made an offence against the United States, unless it ha[s] some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States." *Id.*

Relevant here, Congress enjoys the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I,

§ 8, cl. 3. For much of American history, the Supreme Court interpreted the Commerce Clause narrowly, to reach only post-production, post-manufacturing trade and exchange across state lines. *See Lopez*, 514 U.S. at 554. But in the 1930s, the Court "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause." *Id.* at 556. From 1937 to 1995, the Supreme Court "did not invalidate a single law as unconstitutional for exceeding the scope of Congress's Commerce Power." *See Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 541 (6th Cir. 2011).

The tide turned in *Lopez*, where the Supreme Court demarcated the "outer limits" of Congress' interstate-commerce power. 514 U.S. at 557. At issue in *Lopez* was the Gun-Free School Zones Act of 1990 (GFSZA), which made it illegal "'to possess a firearm at a place that [an] individual knows, or has reasonable cause to believe, is a school zone.'" *Id.* at 551 (quoting 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V)). The Supreme Court facially invalidated the statute, holding the GFSZA "exceeded Congress' power to legislate under the Commerce Clause." *Id.* at 552.

In announcing its ruling, the *Lopez* Court "identified three broad categories of activity that Congress may regulate under its commerce power":

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Id.* at 558-59. When assessing the GFSZA's constitutionality, the Court "quickly disposed of" the "first two categories." *Id.* at 559. A ban on gun possession in school

zones "is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce." *Id.* And § 922(q) could not be "justified as a regulation by which Congress ha[d] sought to protect an instrumentality of interstate commerce or a thing in interstate commerce." *Id.*

The Court therefore turned its attention to the third category, "regulation[s] of an activity that substantially affects interstate commerce." *Id.* Invoking this category, the Court had previously upheld legislation "regulating intrastate *economic* activity where [the Court] concluded that the activity substantially affected interstate commerce." *Id.* (emphasis added). The lesson of those cases was that "[w]here *economic* activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560 (emphasis added). But § 922(q) was "a criminal statute that by its terms ha[d] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561. As the Court put it, the "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567.

The Court wrote that when a statute's "substantial effect" on interstate commerce is not "visible to the naked eye," as was the case with the GFSZA, the Court will "of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce." *Id.* at 562-63. In *Lopez*, however, "neither the [GFSZA] nor its legislative history contain[ed] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." *Id.* at 562. The Court therefore had nothing to consider. And although Congress had made findings

when enacting previous laws "regulati[ng] firearms," the Court concluded that "importation of [those] previous findings to justify § 922(q)" was "inappropriate" because the "prior federal enactments or Congressional findings d[id] not speak to the subject matter of section 922(q) or its relationship to interstate commerce." *Id.* at 563.

The Court had also previously held that if a federal "general regulatory statute bears a substantial relation to commerce," then Congress may regulate conduct under such a statute even if "individual instances" of that conduct have a "de minimis" effect on commerce. *Id.* at 558 (emphasis omitted). But the Court could not rely on this aspect of category three to uphold the GFSZA because § 922(q) was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561. Instead, § 922(q) was "a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." *Gonzales v. Raich*, 545 U.S. 1, 23 (2005).

The Court recognized that a statute may fall within category three if it contains a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at 561. Section 922(q), however, contained no such "express jurisdictional element." *Id.* at 562.

Finally, the Court in *Lopez* addressed the government's arguments for the GFSZA's constitutionality. The government asserted Congress could rationally have concluded that § 922(q) substantially affected interstate commerce because "possession of a firearm in a school zone may result in violent crime and . . . violent crime can be expected to affect the functioning of the national economy in two ways." *Id.* at 563-64. Namely, (1) "the costs of violent crime are substantial, and, through the mechanism of

insurance, those costs are spread throughout the population," and (2) "violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." *Id.* at 564.

The Court rejected this argument. "Under our federal system," the Court wrote, "the States possess primary authority for defining and enforcing the criminal law." *Id.* at 561 n.3. Yet the government's "costs of crime" reasoning would permit Congress to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.* at 564. Congress could even "regulate any activity that it found was related to the economic productivity of individual citizens," such as "family law (including marriage, divorce, and child custody)." *Id.* Under the government's view, it would be "difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." *Id.*

Similarly, the Court rejected the dissent's argument that § 922(q) substantially affected interstate commerce because "gun-related violence is a serious problem," which, "in turn, has an adverse effect on classroom learning," which, "in turn, represents a substantial threat to trade and commerce." *Id.* at 565. That rationale, the Court wrote, "lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial." *Id.* The Court therefore declined to accept either the government's or the dissent's "contentions," which would have required "pil[ing] inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567.

The Supreme Court subsequently affirmed that "the noneconomic, criminal nature of the conduct at issue was central to [its] decision in [*Lopez*]." *United States v. Morrison*, 529 U.S. 598, 610 (2000). "[I]n those cases where [the Court has] sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce," the Court wrote in *Morrison*, "the activity in question has been some sort of economic endeavor." *Id.* at 611. As the Fourth Circuit explained in its seminal post-*Lopez* Commerce Clause case, *Lopez* drew a critical "distinction between regulation of commercial or economic activities and regulation of noncommercial, noneconomic activities." *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 832 (4th Cir. 1999) (en banc).

And, the Fourth Circuit held, this economic/non-economic distinction applies equally in cases where a statute's constitutionality relies on its place within "a general regulatory statute [that] bears a substantial relation to commerce." *Lopez*, 514 U.S. at 558; *see id.* at 561 (concluding § 922(q) could not be upheld under this theory because it was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated"). When a statute is part of "a single, interdependent regulatory scheme," it is permissible under *Lopez* category three *only* if the specific statute in question itself regulates "economic activity." *Brzonkala*, 169 F.3d at 835. If Congress enacts "a general statutory framework regulating economic activity," it may, pursuant to *Lopez* category three, "regulat[e] purely intrastate *economic* activity as well." *Id.* (emphasis in original). But even when Congress has enacted such a general statutory framework, category three does not "authorize the regulation of intrastate conduct falling outside even the Court's

relatively generous conception of economic activity." *Id.* In other words, "a comprehensive statutory scheme that . . . regulates economic activity" does not confer on Congress the additional power to "regulat[e] activity lacking any meaningful economic nexus." *Id.*

### B. Discussion

The statute charged in count twenty-five of the indictment, § 922(o), makes it illegal to "transfer or possess a machinegun." That count alleges only that Mr. Sullivan possessed machineguns, not that he transferred them. ECF 51 at 28. Accordingly, Mr. Sullivan here challenges only § 922(o)'s ban on possession of a machinegun. For the reasons described below, that prohibition is not authorized by Congress' power to regulate interstate commerce. Count twenty-five should therefore be dismissed.

#### 1. Like the GFSZA in *Lopez*, § 922(o)'s ban on possession of a machinegun cannot be justified by Congress' power to regulate interstate commerce.

Section 922(o) is essentially "a clone of § 922(q), the provisio[n] struck down in *Lopez*." *United States v. Kirk*, 105 F.3d 997, 1010 (5th Cir. 1997) (en banc) (opinion of Jones, J., joined by Garwood, Jolly, Smith, Duhe, Barksdale, Garza, and DeMoss, JJ.), *affirming district court by an equally divided vote*; *accord Rybar*, 103 F.3d at 286-87 (Alito, J., dissenting) ("The statutory provision challenged in this case, the portion of 18 U.S.C. § 922(o) that generally prohibits the purely intrastate possession of a machine gun, is the closest extant relative of the statute struck down in *Lopez*."). Accordingly, for all the reasons that the Commerce Clause could not provide a constitutional basis for § 922(q), it also cannot support § 922(o)'s constitutionality.

*Lopez* identified three "categories of activity that Congress may regulate under its commerce power." 514 U.S. at 558. As the Supreme Court did in *Lopez*, this Court can

"quickly dispos[e] of" the first two categories. *Id.* at 559. *Lopez* reasoned that "§ 922(q) is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can § 922(q) be justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce." *Id.* The same is true here. If a ban on possessing firearms in a school zone is not a regulation of the channels or instrumentalities of interstate commerce, then neither is a ban on possessing machineguns. There are no material differences between § 922(q) and § 922(o) in this regard.

That leaves the third *Lopez* category: "regulation[s] of an activity that substantially affects interstate commerce." *Id.* This category, too, fails to provide a constitutional basis for § 922(o).

The Court explained in *Morrison* that "the noneconomic, criminal nature of the conduct at issue was central" to the outcome in *Lopez*. 529 U.S. at 610. Although *Morrison* stopped short of adopting "a categorical rule against aggregating the effects of any *noneconomic* activity" under *Lopez*'s third category, the Court did note that "thus far in our Nation's history [the Court's] cases ha[d] upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Id.* at 613 (emphasis added). And the Court "reject[ed] the argument that Congress may regulate *noneconomic*, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617 (emphasis added). The Fourth Circuit, for its part, has held that pursuant to *Lopez* category three, courts may "loo[k] to the aggregate effects of entire classes of activities"—but only for purposes of "find[ing] that intrastate *economic* activity

substantially affects interstate commerce." *Brzonkala*, 169 F.3d at 839 (emphasis in original). By contrast, "*Lopez* clearly forecloses . . . application of such analysis to sustain congressional regulation of *noneconomic* activities." *Id.* (emphasis in original); *see also id.* at 855 ("[*Lopez*] drew a clear distinction between regulations of economic and noneconomic activities, limiting to the former category the reach of the authority and reasoning of its most permissive Commerce Clause cases.").

The economic/non-economic distinction dictates the outcome of this case. In *Lopez*, the Supreme Court held that § 922(q), which prohibits possession of a firearm, "has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 U.S. at 561. The "possession of a gun in a local school zone," the Court wrote, "is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567. If possessing a gun in a school zone is non-economic, then so is possessing a machinegun. As then-Judge Alito put it:

> The activity that the *Lopez* Court found was not "economic" or "connected with a commercial transaction" was a type of intrastate firearm possession, *i.e.*, the possession of a firearm (including a machine gun) within a school zone. At issue here is another type of purely intrastate firearm possession, *i.e.*, the purely intrastate possession of a machine gun. If the former must be regarded as non-economic and non-commercial, why isn't the same true of the latter? Is possession of a machine gun inherently more "economic" or more "commercial" than possession of other firearms?

*Rybar*, 103 F.3d at 291 (Alito, J., dissenting). The answer to this rhetorical question is "no": the "most natural reading of *Lopez* is that the simple possession of a firearm, without more, is not 'economic' or 'commercial' activity." *Id.* at 292; *see also United States v. Stewart*, 451 F.3d 1071, 1073 (9th Cir. 2006) ("[T]here is nothing inherently economic or commercial about mere possession of an object.") (addressing Commerce

Clause challenge to § 922(o)); *United States v. Beuckelaere*, 91 F.3d 781, 788 (6th Cir. 1996) (Suhrheinrich, J., dissenting) ("Like § 922(q), § 922(o) as applied to possession has nothing to do with commerce or any sort of economic enterprise."); *Kirk*, 105 F.3d at 1014 (opinion of Jones, J.) (same). Because possession of a machinegun is non-economic activity, § 922(o) cannot be sustained as a regulation of "activities having a substantial relation to interstate commerce." *Lopez*, 514 U.S. at 558-59.

For the same reason, the Court cannot uphold § 922(o) on the theory that it is "part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561. Some courts have treated § 922(o) as part of a broad congressional scheme regulating the manufacture and transfer of machineguns. *See, e.g.*, *United States v. Kenney*, 91 F.3d 884, 890 (7th Cir. 1996); *Stewart*, 451 F.3d at 1076. But even assuming that is true, it does not save § 922(o). The Fourth Circuit has held that even when a statute is part of "a single, interdependent regulatory scheme," it does not pass muster under *Lopez* category three unless the particular statute being challenged regulates "*economic* activity." *Brzonkala*, 169 F.3d at 835 (emphasis added); *see also id.* (explaining that a comprehensive regulatory regime does not allow Congress to "regulat[e] intrastate conduct" that does not amount to "*economic* activity" (emphasis added)). And as explained above, *Lopez* leaves no doubt that mere possession of a firearm "is in no sense an economic activity." 514 U.S. at 567.

Even if—contrary to *Lopez*—possession of a machinegun could somehow be described as "economic" activity, any "substantial effect" that § 922(o) has on interstate commerce is not "visible to the naked eye." *Id.* at 563. If aggregated possessions of

firearms in a school zone do not substantially affect interstate commerce, as *Lopez* held, then there is no reason to believe that aggregated possessions of machineguns do. This Court might, in theory, rely on congressional findings to fill the void. *See id.* at 562. But Congress "failed to make any legislative findings when it enacted [§ 922(o)] that might have explained and justified Congress's policy choices." *Stewart*, 451 F.3d at 1074; *see also Kirk*, 105 F.3d at 1007 (opinion of Jones, J.) ("[T]he legislative history of § 922(o) itself provides no insight into the relationship between § 922(o) and interstate commerce."). Indeed, the "only apparent explanation in the legislative record for the enactment of § 922(o) was the statement of its sponsor, Representative Hughes: 'I do not know why anyone would object to the banning of machineguns.'" *Wright*, 117 F.3d at 1269 n.5 (quoting 132 Cong. Rec. H1750 (daily ed. April 10, 1986)).

Furthermore, § 922(o), like § 922(q), "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at 561. The statute's "reach" therefore cannot be "limit[ed] to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at 562. For all these reasons—i.e., the reasons that *Lopez* found the GFSZA unconstitutional—§ 922(o) cannot be sustained under *Lopez*'s third Commerce Clause category.

And, as in *Lopez*, it is worth "paus[ing] to consider the implications" of a ruling that § 922(o) is a permissible exercise of Congress' power to regulate interstate commerce. *Id.* at 564. "[T]he *Lopez* Court was emphatic that it would not find an activity sufficiently related to interstate commerce to satisfy the substantially affects test in reliance upon arguments that lacked any principled substantive limitations and that

consequently would justify plenary federal regulation of anything." *Brzonkala*, 169 F.3d at 855; *see also id.* at 858-59 (noting *Lopez* was "concern[ed] with the *implications* of the government's arguments," which "lack[ed] any principled limitations and would justify federal regulation of *any* activity" (first emphasis in original)). Yet, to "uphold a statute regulating *noneconomic* activity merely because that activity, in the aggregate, has an attenuated, though real, effect on the economy, and therefore presumably on interstate commerce, would be effectively to remove all limits on federal authority, and to render unto Congress a police power impermissible under our Constitution." *Id.* at 840 (emphasis added). In then-Judge Alito's words, holding § 922(o) constitutional "would go far toward converting Congress's authority to regulate interstate commerce into 'a plenary police power'" of the kind that only the states enjoy:

> If there is any sort of interstate market for a commodity—and . . . it is safe to assume that there is some sort of interstate market for practically everything—then the purely intrastate possession of that item will have an effect on that market, and outlawing private possession of the item will presumably have a substantial effect. Consequently, [upholding § 922(o)] leads to the conclusion that Congress may ban the purely intrastate possession of just about anything. But if *Lopez* means anything, it is that Congress's power under the Commerce Clause must have some limits.

*Rybar*, 103 F.3d at 291 (Alito, J., dissenting) (quoting *Lopez*, 514 U.S. at 566); *see also Brzonkala*, 169 F.3d at 851 (noting that there "undoubtedly exists" a "relationship" "between *any* significant activity and interstate commerce" (emphasis added)).

Even under Congress' "modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds." *Morrison*, 529 U.S. at 608. If § 922(o) is a lawful exercise of Congress' interstate-commerce power, it is unclear where, exactly, those bounds lie.

### 2. The Supreme Court's opinion in *Gonzales v. Raich* does not require a different outcome.

Mr. Sullivan anticipates the government will argue that, notwithstanding the similarities between this case and *Lopez*, § 922(o) is constitutional under the Commerce Clause analysis in *Gonzales v. Raich*, 545 U.S. 1 (2005), decided ten years after *Lopez*. As explained below, that view is mistaken.

The respondents in *Raich* were medical-marijuana users and their "caregivers" who grew marijuana for personal consumption, in compliance with California state law but in violation of the federal Controlled Substances Act (CSA). 545 U.S. at 6-7. They argued "that the CSA's categorical prohibition of the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress' authority under the Commerce Clause." *Id.* at 15. Thus the question presented in *Raich* was "whether Congress' power to regulate interstate markets for medicinal substances encompasses the portions of those markets that are supplied with drugs produced and consumed locally." *Id.* at 9. The Supreme Court answered that question in the affirmative.

The Court wrote that under the third *Lopez* category, Congress may "regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Id.* at 17. In particular, *Lopez* category three permits Congress to "regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18. The Court concluded that marijuana is "a fungible commodity for which there is an established, albeit illegal, interstate market," and that Congress therefore "had a rational

basis for concluding that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions." *Id.* at 19. As the Court explained, Congress could rationally conclude that "the diversion of homegrown marijuana tends to frustrate the federal interest in eliminating commercial transactions in the interstate market in their entirety." *Id.* The CSA, as applied to the respondents, therefore fell within Congress' commerce power "because production of the commodity meant for home consumption . . . has a substantial effect on supply and demand in the national market for that commodity." *Id.*

*Raich* distinguished *Lopez* on two grounds. First, the GFSZA "was a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." *Id.* at 23. The CSA, by contrast, is "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of controlled substances." *Id.* at 24. "[U]nlike the discrete prohibition established by the Gun-Free School Zones Act of 1990," marijuana's classification as a controlled substance "was merely one of many 'essential parts of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Id.* (quoting *Lopez*, 514 U.S. at 561).

Second, the GFSZA "'ha[d] nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms.'" *Id.* at 24 (quoting *Lopez*, 514 U.S. at 561). Conversely, "the activities regulated by the CSA are quintessentially economic." *Id.* at 25. "'Economics,'" the Court explained, "refers to 'the production, distribution, and consumption of commodities.'" *Id.* at 25-26 (quoting Webster's Third New International Dictionary 720 (1966)). And the CSA fits this

definition because it "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." *Id.* at 26. The application of the CSA to respondents was therefore permissible because "[p]rohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Id.*

This reasoning does not suggest § 922(o) is constitutional. By distinguishing *Lopez* on the basis that "the activities regulated by the CSA are quintessentially *economic*," *Raich* reaffirmed that *Lopez*'s third category does not permit regulation of non-economic activities. 545 U.S. at 25 (emphasis added); *see Morrison*, 529 U.S. at 611 ("[I]n those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor."). *Raich* also reaffirmed *Lopez*'s holding that the "possession of a gun in a local school zone is in no sense an economic activity." *Lopez*, 514 U.S. at 567; *see Raich*, 545 U.S. at 24. And if that is true, then possession of a machinegun cannot be "economic," either, which means it is beyond the reach of Congress' power under *Lopez* category three. Because § 922(o) does not "directly regulat[e] *economic, commercial* activity," as the CSA does, it is different from the statute upheld in *Raich*. 545 U.S. at 26 (emphasis added).

This conclusion is consistent with *Raich*'s construal of the term "economics," which the Court defined as "the production, distribution, and consumption of commodities." *Id.* at 25. Possessing a machinegun obviously does not qualify as production or distribution. Nor does it qualify as consumption. "Consumption is the 'act of destroying a thing by using it; the use of a thing in a way that thereby exhausts it.'"

*United States v. Patton*, 451 F.3d 615, 625 (10th Cir. 2006) (quoting *Black's Law Dictionary* 336 (8th ed. 2004)). Possessing and using a machinegun "neither destroys nor exhausts it." *Id.* (making same point about body armor). By contrast, possession and use *do* destroy and exhaust marijuana. Once someone has smoked a marijuana cigarette, it has been used up and serves no further purpose; in a word, it has been "consumed." Thus the activity in *Raich* was "economic" in a way that the conduct proscribed by § 922(o) is not.

Finally, this Court can assume for sake of argument that § 922(o) is part of "a larger regulation of economic activity" in machineguns. *Lopez*, 514 U.S. at 561; *see, e.g.*, *Kenney*, 91 F.3d at 890. Even so, *Raich* does not abrogate the en banc Fourth Circuit's holding in *Brzonkala* that Congress cannot use a "comprehensive statutory scheme that . . . regulates economic activity" to regulate conduct that is not itself "economic." 169 F.3d at 835. *Raich* held Congress could prohibit intrastate possession of marijuana as a "means of regulating commerce in that product," 545 U.S. at 26, but that statement must be read in context. The Court in *Raich* addressed an as-applied challenge brought by respondents who grew their own marijuana, which they subsequently possessed for personal consumption. As a result, the respondents' possession in *Raich* was necessarily and inextricably tied up in two "quintessentially economic" activities: (1) the respondents' own production of a good for which there was "an established . . . interstate market," *id.* at 18; and (2) their own "consumption" of that good, *see id.* at 25 ("'Economics' refers to 'the production, distribution, and *consumption* of commodities.'" (emphasis added)). Possession was a product of, and a prerequisite to, those prototypically economic activities.

*Raich*'s language reflects this understanding of simple possession. When the Court discussed possession in *Raich*, it consistently referred to possessing marijuana as incident to the possessors' own production of that item, or as intrinsically connected to the possessors' subsequent consumption of it. *See, e.g.*, *id.* at 5 ("The question presented in this case is whether [Congress has] the power . . . to prohibit the local *cultivation and use* of marijuana." (emphasis added)); *id.* at 9 ("The question before us . . . is whether Congress' power to regulate interstate markets for medicinal substances encompasses the portions of those markets that are supplied with drugs *produced and consumed* locally." (emphasis added)); *id.* at 15 ("[Respondents] argue that the CSA's categorical prohibition of the *manufacture and possession* of marijuana as applied to the intrastate *manufacture and possession* of marijuana for medical purposes pursuant to California law exceeds Congress' authority under the Commerce Clause." (emphasis added)); *id.* at 18 ("[R]espondents are *cultivating, for home consumption*, a fungible commodity for which there is an established, albeit illegal, interstate market." (emphasis added)); *id.* at 19 ("The parallel concern making it appropriate to include marijuana *grown for home consumption* in the CSA is the likelihood that the high demand in the interstate market will draw such marijuana into that market." (emphasis added)); *id.* ("[T]he regulation is squarely within Congress' commerce power because *production* of the commodity meant for home *consumption* . . . has a substantial effect on supply and demand in the national market for that commodity." (emphasis added)); *id.* at 21 ("Respondents nonetheless insist that the CSA cannot be constitutionally applied to their activities because Congress did not make a specific finding that the intrastate *cultivation and possession* of marijuana for medical purposes based on the recommendation of a physician would substantially

affect the larger interstate marijuana market." (emphasis added)); *id.* at 22 ("Given the enforcement difficulties that attend distinguishing between marijuana *cultivated* locally and marijuana *grown* elsewhere, and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate *manufacture and possession* of marijuana would leave a gaping hole in the CSA." (emphasis added)); *id.* at 28 ("One need not have a degree in economics to understand why a nationwide exemption for the vast quantity of marijuana (or other drugs) locally *cultivated for personal use* . . . may have a substantial impact on the interstate market for this extraordinarily popular substance." (emphasis added)).

*Raich* did not hold that possession of an item, standing alone, is an "economic" activity that can be regulated under the Commerce Clause. Rather, it held only that when someone—(1) produces her own perishable item, and then (2) "consum[es]" it—Congress can regulate the possession that is necessarily attendant to those "quintessentially economic" activities. *Id.* at 25. This logic does not apply to § 922(o). Under that statute, a machinegun need not be produced or manufactured by its possessor. And as explained above, possessing and using a machinegun does not "consum[e]" it in the same way that possessing and using marijuana consumes that product. *Raich* therefore does not bring § 922(o) within Congress' power to regulate interstate commerce.

## III. Conclusion

Congress exceeded its Commerce Clause power when it enacted 18 U.S.C. § 922(o). For that reason, the Court should dismiss count twenty-five of the indictment.

/s/

Jim Wyda
Federal Public Defender
Jonathan Hettleman
Assistant Federal Public Defender
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
(410) 962-3962
jim_wyda@fd.org
jonathan_hettleman@fd.org